**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**GORSS MOTELS, INC. and
E & G, INC.,**

      **Plaintiffs,**

**v.**                                        Case No: 6:16-cv-01638-Orl-31DCI

**SAFEMARK SYSTEMS, LP,**

      **Defendant.**

## ORDER

This matter comes before the Court on the Motion for Class Certification (Doc. 60) filed by the Plaintiffs, Gorss Motels Inc. (henceforth, "Gorss") and E & G, Inc. ("E&G); the response in opposition (Doc. 70) filed by the Defendant, Safemark Systems, LP ("Safemark"); and the reply (Doc. 78) filed by the Plaintiffs.

**I.    Introduction**

Gorss and E&G are, respectively, former and current franchisees of Wyndham Hotel Group ("Wyndham"). They bring this putative class action against Safemark regarding faxes sent by or on behalf of Safemark in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227. (*See* Doc. 43).

**II.    Background**

To fully appreciate the facts of this case, it is helpful to understand the nature of the relationship between the Plaintiffs, the Defendant, and non-party Wyndham.

**A.  Wyndham Hotel Group**

WHG is one of the world's largest hotel franchise companies. (Doc. 70-6, ¶ 3). It owns numerous franchising subsidiaries in the lodging industry, including Super 8 Worldwide, Inc.

("SWI") and Wingate Inns International, Inc. ("WII"), which offer and support lodging franchises under the Super 8 and Wingate guest lodging franchise systems, respectively. (*Id.* ¶ 6; Doc. 70-4, ¶2).

### B. Plaintiffs Gorss and E&G

In 1988, Gorss entered into a franchise agreement with Super 8 Motels, Inc. (now SWI) for the operation of a Super 8 motel for an initial term of twenty years. (*See* Doc. 70-6, ¶ 7; *see id*. at 12-38) (the "1988 Franchise Agreement"). By amendment dated March 11, 2009, the parties extended the term of the 1988 Franchise Agreement through August 15, 2014. (*Id.* ¶ 7). Upon the expiration of the 1988 Franchise Agreement, Gorss entered into another franchise agreement with SWI on September 10, 2014, for the continued operation of its Super 8 motel for an additional twenty years. (Doc. 70-7, ¶ 5; Doc. 70-6, pp. 41-87 (the "Gorss Franchise Agreement")). The Gorss Franchise Agreement terminated in 2016 when Gorss sold its Super 8 motel. (Doc. 70-6, ¶ 21).

In 1997, E&G entered into a franchise agreement with Hotel Franchising Limited Partnership (now WII) for the operation of a Wingate hotel. (Doc. 70-7, ¶ 9; Doc. 70-6, pp. 200–239 ("E&G Franchise Agreement")). The term of the E&G Franchise Agreement extends through July 8, 2018. (Doc.70-6, ¶ 26).

In executing their respective franchise agreements, Plaintiffs agreed to operate their lodging facilities in accordance with certain standards (henceforth, the "System Standards") established by their franchisors – SWI and WII. (Doc. 70-6, pp. 42–47; 200–205). To comply with the System Standards, Plaintiffs agreed to, *inter alia,* purchase certain proprietary items from Wyndham's "Approved Suppliers." (*See id.* at 46, 204). Plaintiffs also agreed that their franchisors

and their franchisors' affiliates could offer optional assistance with regard to purchasing items for their motels. (*See id*. at 50, 207).

### C. Wyndham's Approved Supplier Program

To assist its franchisees with their efforts to obtain services and items for their motels, Wyndham developed an "Approved Supplier program." (Doc. 70-7, ¶ 17, 18; Doc. 70-4, ¶¶ 3–4). The Approved Supplier program is offered through a Wyndham affiliate, Worldwide Sourcing Solutions, Inc. ("Worldwide Sourcing"), which identifies and approves third-party suppliers and service providers. (Doc. 70-4, ¶ 4). Vendors that meet Worldwide Sourcing's criteria are referred to as "Approved Suppliers." (*Id.*). Wyndham and Worldwide Sourcing identify Approved Suppliers to franchisees by, among other things, publishing a supplier directory and by allowing them to attend and set up displays at conferences for franchisees.

### D. Defendant Safemark

Safemark is a Florida corporation that sells and leases safes to hotels and motels. (Doc. 70-3 ¶ 3). Safemark has been an Approved Supplier since 2002. (Doc. 70-4, ¶ 15). In March 2012, Safemark entered into a 'Second Amendment to Vendor Direct Supplier Agreement' with Worldwide Sourcing wherein Safemark agreed to supply in-room safes to Wyndham franchisees. (*Id.*).

Worldwide Sourcing authorized Safemark to communicate with franchisees regarding the products offered as part of the Approved Supplier program. (Doc. 70-4, ¶ 16). Worldwide Sourcing regularly provides Safemark with a database that contains contact information for Wyndham's franchisees. (Doc. 70-3, ¶¶ 10, 11). Worldwide Sourcing also provides Safemark, and other Approved Suppliers, the opportunity to participate in marketing programs that are

directed to franchisees, including one in which Worldwide Sourcing uses a fax broadcaster to send faxes to franchisees on behalf of the Approved Suppliers. (*Id.* ¶ 12).

### III. The Faxes

#### A. The 2013 Fax

In August 2013, Wyndham emailed Safemark a database with contact information for its franchisees. (Doc. 70-9, ¶ 5, pp. 7–8). On September 4, 2013, and September 6, 2013, Safemark used a fax broadcasting company to transmit a one-page fax to the franchisees listed in the Database. (*Id.* ¶¶ 5; Doc. 60-4, pp. 4–5; Doc. 43-1, pp. 3–4). These faxes (the "2013 Faxes") state in pertinent part: "Free month (average value $500 per 100 rooms," "Free Battery replacement every 18 months for initial term of contract (3 times)," and "1 Free Safe for Office." (Doc. 41-1, pp. 2–3).

Safemark admits, and Plaintiffs' expert, Robert Biggerstaff ("Biggerstaff") confirmed, that the 2013 Faxes were successfully sent in 7,402 fully received error-free transmissions, including two transmissions to Plaintiff Gorss's fax number. (Doc. 60-2, ¶ 18; Doc. 60-4, p. 5). According to Safemark's answer to an interrogatory, of the 7,402 faxes that were successfully transmitted, approximately 1,000 were sent to former or current customers of Safemark, whose fax numbers were provided directly by the customer and/or Wyndham. (Doc. 60-4, p. 7; Doc. 70-9, ¶¶ 6–7).

#### B. The 2015 Fax

On December 1, 2015, Wyndham transmitted a multi-page fax to its franchisees promoting the products and services of five companies: Safemark; Mount Vernon Mills, Inc.; American Hotel Register Company; Sema Connect, Inc.; and Sprint Communications Company.[1] (Doc. 60-

---

[1] E&G has filed separate nationwide class action suits against all of the remaining companies advertised the in 2015 fax, except Sprint. *See E&G, Inc. v. Am. Hotel Register Co.*, 1:17-cv-01011 (N.D. Ill. February 7, 2017); *E&G, Inc. v. SemaConnect Inc.*, 2:17-cv-02774 (S.D.

4, pp. 4–5; Doc. 70-2, pp. 61–65). The single-page promotion for Safemark (henceforth, the "2015 Fax") states in pertinent part: "Attention owners and hotel employees: Increase Cash Flow at NO COST!" and "Learn more today at Safemark.com." (Doc. 60-4, pp. 63).

In discovery, the Plaintiffs obtained fax logs from the fax broadcaster used by Wyndham. After examining the fax logs, Biggerstaff concluded that the 2015 Fax was successfully sent in 3,328 fully received error-free transmissions. (Doc. 60-2, ¶ 15). Biggerstaff also searched the fax logs for each Plaintiff's fax number; he found one successful transmission to each of them. (*Id*. ¶¶ 20, 24).

**IV.     This Action**

The Plaintiffs allege that Safemark violated the TCPA by sending the 2013 and 2015 Faxes to Plaintiffs and other similarly-situated entities. (Doc. 43). Pursuant to Rules 23(a) and 23(b)(3), Plaintiffs seek an order certifying the following two classes:

<u>Class A – 2013 Faxes</u>

> All persons or entities successfully sent one or more facsimiles on or about September 4, 2013, and September 6, 2013, stating "Free month (average value $500 per 100 rooms," "Free Battery replacement every 18 months for initial term of contract (3 times)," and "1 Free Safe for Office."

<u>Class B – 2015 Fax</u>

> All persons or entities successfully sent a facsimile on or about December 1, 2015, stating "Attention owners and hotel employees: Increase Cash Flow at NO COST!" and "Learn more today at Safemark.com."

(*See* Doc. 60 p. 3). Safemark opposes certification. (*See* Doc. 70).

---

W. Va. May 5, 2017); *E&G, Inc. v. Mount Vernon Mills, Inc.* 6:17-cv-00318 (D. S. Car. February 2, 2017). Notably, E&G has not added WHG as a party to any of those lawsuits.

## V.     Legal Standard for Class Actions

A class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). To justify a departure from that rule, the plaintiff, as the class representative, must satisfy the four requirements of Federal Rule of Civil Procedure 23(a) and one of the conditions of Rule 23(b). *See Rutstein v. Avis Rent-a-Car Sys.*, Inc., 211 F.3d 1228, 1233 (11th Cir. 2000) (citation omitted); *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir. 1984). In pertinent part, Rule 23(a) and Rule 23(b) provide that:

> (a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) **Class Actions Maintainable.** An action may be maintained as a **class action** if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(a), (b).

In determining whether to certify a class, the court must generally view the allegations in the complaint in the light most favorable to the plaintiffs, but, in doing so, the court need not artificially limit its examination of the factors relevant to class certification. *Gibbs Props. Corp. v. Cigna Corp.,* 196 F.R.D. 430, 435 (M.D. Fla. 2000). "[S]ometimes it may be necessary for the

court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). However, Rule 23 does not give the Court authority "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

## VI. Discussion

In this case, Safemark contests all aspects of the Rule 23 certification inquiry except the numerosity requirement. (*See* Doc. 70). All of requirements under Rule 23 are important and must be satisfied, but the requirements of Rule 23(b)(3) usually presents a "far more demanding" obstacle for certification than Rule 23(a). *See In re Photochromic Lens Antitrust Litig.*, No. 8:10-cv-00984-T-27EA, 2014 WL 1338605, at *16 (M.D. Fla. Apr. 3, 2014); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Court will therefore begin its Rule 23 analysis by assuming, *arguendo*, that the Rule 23(a) requirements are satisfied and turn its attention to the more challenging requirement of Rule 23(b)(3).

To meet this requirement, the Plaintiffs must demonstrate that: (1) questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (citing Fed. R. Civ. P. 23(b)(3); *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1265 (11th Cir. 2009). "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay v. Humana, Inc*., 382 F.3d 1241, 1255 (11th Cir. 2004) (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). Common issues do not predominate over individual

questions "if, 'as a practical matter, the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'" *Cooper v. S. Co.*, 390 F.3d 695, 722 (11th Cir. 2004) (quoting *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

In determining whether questions of law or fact common to class members predominate, courts must consider elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011). Here, Plaintiffs seek certification of two proposed classes based on Safemark's purported TCPA violations. To prevail on their TCPA claims, Plaintiff must demonstrate that: (1) Safemark sent the subject faxes to a telephone facsimile machine using a telephone facsimile machine, computer, or other device; (2) the faxes were advertisements; and (3) the faxes were unsolicited. *See Daisy, Inc. v. Pollo Operations, Inc.*, No. 2:14-cv-564-FTM-38CM, 2015 WL 1418607, at *3 (M.D. Fla. Mar. 27, 2015) (citing 47 U.S.C. § 227(b)(1)(C)).

Only the third element is at issue here. The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). The TCPA does not define express consent. However, Congress delegated to the FCC the authority to make rules and regulations to implement the TCPA. 47 U.S.C. § 227(b)(2). Under this rulemaking authority, the FCC has stated:

> [P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 F.C.C.R. 8752, ¶ 31 (1992) (the 1992 FCC Order).

The predominance requirement in TCPA actions often turns on whether individualized inquiries – rather than generalized proof – are required to demonstrate an individual class member's prior express consent. Whether the issue of prior express consent can be resolved with generalized proof depends on the circumstances of each case. Several courts have declined to certify TCPA class actions after finding that individual issues regarding consent predominated over common questions of fact,[2] while other courts have found that issues of consent did not predominate over common issues of fact.[3]

Here, Safemark contends that common issues do not predominate because determining whether putative class members consented to receiving the faxes would require a series of individual factual determinations. (*See* Doc. 70, pp. 22–26). The Court agrees. Safemark has produced evidence showing that Plaintiffs entered into franchise agreements, wherein they agreed that their franchisors and its affiliates could offer them assistance with purchasing items used at

---

[2] *See, e.g.*, *Gene & Gene L.L.C. v. BioPay, L.L.C.*, 541 F.3d 318, 326–29 (5th Cir.2008) (holding that class certification of a TCPA claim based on blast faxes was inappropriate because there was no generalized, class-wide basis to establish whether individual class members had consented to receipt of such faxes); *see Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017) (concluding that the district court was correct in finding that individualized questions of consent prevent common questions from predominating under Rule 23(b)(3); *Hicks v. Client Servs., Inc.*, No. 07-61822-CIV, 2008 WL 5479111, at *7 (S.D. Fla. Dec. 11, 2008) (concluding that "consent is an issue "that would have to be determined on an individual basis at trial"); *Gannon v. Network Tel. Servs., Inc.*, No. CV 12–9777–RGK (PJWx), 2013 WL 2450199, at *3 (C.D. Cal. Jun. 5, 2013) (holding predominance requirement not satisfied where issue of consent required individual inquiry regarding class members' interactions with defendant).

[3] *See, e.g.*, *Dr. Robert L. Meinders D.C., Ltd v. Emery Wilson Corp.*, No. 14-cv-596-SMY-SCW, 2016 WL 3402621 (S.D. Ill. June 21, 2016) (rejecting defendant's argument the individual issues as to consent predominate where the defendant sent fax advertisements to its customers and provided evidence that some of them gave prior express permission, but argued that there was no class-wide way to determine prior express permission "due to lack of record keeping"); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *6 (N.D. Ill. Aug. 20, 2009) (explaining that the defendant could not "defeat class certification by asserting the vague possibility that some of the individuals on the anonymous lists have perchance consented to receiving the fax.").

or in their facilities. (*See* Doc. 70-6, pp. 50, 207).[4] In addition to executing their respective franchise agreements, Plaintiffs provided their fax information to their respective franchisors several times during the course of their franchise relationships. (*See*, *e.g.*, Doc. 70-6, pp. 62, 89–92, 94–97, 219, 241–249).

According to an affidavit submitted by the Vice President of Marketing Communications & Technical Solutions for Worldwide Sourcing, "franchisees that provide [Wyndham] with their fax numbers want to receive communications by fax, and the fax program has been a successful method for sharing information about Approved Suppliers." (Doc. 70-4, ¶ 13). Based on the records of Worldwide Sourcing, neither Gorss nor E&G opted out of receiving faxes sent as part of the Approved Supplier program. (*Id.* ¶ 19). Nor did Plaintiffs inform Worldwide Sourcing that they objected to or did not want to receive facsimile communications regarding Approved Suppliers. (*Id.*).

Although Plaintiff contends otherwise, this evidence, at the very least, raises a question as to whether Plaintiffs consented to receiving the faxes from Wyndham and Safemark.[5] Whether the same issues regarding consent exist with respect to the putative class members would require an individualized analysis of each class member's particular franchise agreement(s), thereby resulting in mini-trials incompatible with class certification.

---

[4] The record also reveals that Gorss also executed a 2014 Property Improvement Plan Report ("PIP") in 2014, wherein it agreed that its franchisor could provide Wyndham's approved vendors with Gorss's contact information for the purpose of offering Gorss products and services required to complete the PIP. (*See* Doc. 70-6, p. 83).

[5] The Court emphasizes that at the certification stage, the ultimate merits of the issue of consent – *i.e.*, whether Plaintiffs did or did not provide consent to be called by Safemark – is not currently before the Court. Instead, at this stage of the litigation, the Court must determine whether the issue of consent is a common issue with a common answer that predominates over any individual issues.

Safemark has also submitted unrefuted evidence that that many recipients of the faxes are, or were, Safemark customers, "whose numbers were provided directly by the customer." (*See* Doc. 60-4, p. 7; Doc. 70-9, p. 7). Therefore, it is possible – indeed, likely – that the Court will also be required to conduct individual inquiries into whether each class member provided fax numbers and consented to receiving fax advertisement from Safemark during the course of their business dealings. Furthermore, if, as Safemark claims, "many franchisees provided Safemark with their contact information" while attending one of Wyndham's franchisee conferences (*see* Doc. 70, p. 25), the Court will also need to individually determine whether each class member provided its fax information to Safemark in this manner.

Plaintiffs point to no generalized proof that can be used to resolve the issue of consent on a class-wide basis. (*See generally* Docs. 60, 78). Instead, they argue that even if Defendant could prove that the faxes were solicited (*i.e.*, sent with express consent), Plaintiffs' claims can be decided on a class basis because Federal Communications Commission ("FCC") regulations require that *solicited* faxes contain an opt-out notice and none of the subject Faxes contain such a notice. (Doc. 78, pp. 10–12 (citing 47 C.F.R. § 64.1200(a)(4)(iv) (the "Solicited Fax Rule")).

Plaintiffs' argument lacks merit. In 2017, a split panel of the U.S. Court of Appeals for the District of Columbia Circuit struck down the Solicited Fax Rule, holding it unlawful to the extent that it required opt-out notices on solicited faxes. *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017). Applying the *Chevron* framework, the majority found that the clear text of the TCPA reached only unsolicited fax advertisements and that the FCC was thus without the authority to promulgate a rule governing solicited faxes. *See id*. at 1082 (citing *Chevron USA Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 & n.9, (1984)) (explaining that

"Congress drew a line in the text of the statute between unsolicited fax advertisements and solicited fax advertisements").

The Eleventh Circuit has not had an opportunity to consider the D.C. Circuit's recent decision invalidating the Solicited Fax Rule, but the U.S. Court of Appeals for the Sixth Circuit and a few district courts have followed the D.C. Circuit's decision. *See, e.g.*, *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017); *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257, at *1 (N.D. Ill. Jan. 18, 2018); *Alpha Tech Pet Inc. v. LaGasse, LLC*, No. 16 C 4321, 2017 WL 5069946, at *1 (N.D. Ill. Nov. 3, 2017). Those courts have also concluded that *Bais Yaakov* is binding outside the D.C. Circuit because the Multidistrict Litigation Panel assigned petitions challenging the Solicited Fax Rule to the D.C. Circuit, thereby making the D.C. Circuit "the sole forum for addressing . . . the validity of the FCC's rule[ ]." *See Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257, at *1; *Alpha Tech Pet Inc.*, 2017 WL 5069946, at *1.

Without determining whether *Bais Yaakov* is binding in this Circuit, the Court finds the opinion to be persuasive.[6] Therefore, the Court will not apply the Solicited Fax Rule to the facts

---

[6] The Court acknowledges that other courts – specifically, *Orrington, II, D.D.S. PC v. Scion Dental Inc.*, No. 17-CV-00884, 2017 WL 2880900, at *2 (N.D. Ill. July 6, 2017) and *Physicians Healthsource, Inc. v. Allscripts Health Sols. Inc.*, No. 12 C 3233, 2017 WL 2391751, at *3 (N.D. Ill. June 2, 2017) – have declined to follow *Bais Yaakov* and instead opted to follow a 2013 decision from the U.S. Court of Appeals for the Seventh Circuit, wherein the court stated in *dicta*:

> Even when the [TCPA] permits fax ads – as it does to persons who have consented to receive them, or to those who have established business relations with the sender – the fax must tell the recipient how to stop receiving future messages. 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D).

*Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). However, the Court declines to follow in the footsteps of *Orrington* or *Physicians Healthsource* because the *Turza* Court never

of this case. Given that the Solicited Fax Rule does not apply, and the issues of consent cannot be resolved without individualized inquiry, the Court finds that common issues of fact do not predominate and that class certification is inappropriate.

### VII. Conclusion

Accordingly, it is **ORDERED** that Plaintiffs' Motion to Certify Class (Doc. 60) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on April 5, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

actually scrutinized the Solicited Fax Rule. *See generally Turza*, 728 F.3d at 682. In fact, the only question on the merits in *Turza* was whether *unsolicited* faxes contained ads. *See id.* at 685.