# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 26, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  18-12511-FF   ; 18-15232 -FF
Case Style:  Gorss Motels, Inc., et al v. Safemark Systems, LP
District Court Docket No:  6:16-cv-01638-GAP-DCI

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxd against appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Team 2 Vacant, FF at 404-335-6130.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs

[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

Nos. 18-12511, 18-15232

_____

D.C. Docket No. 6:16-cv-01638-GAP-DCI

GORSS MOTELS, INC.,
a Connecticut corporation, individually and
as the representative of a class of similarly situated persons,
E&G, INC., a West Virginia corporation, individually and
as the representatives of a class of similarly situated persons,

                                              Plaintiffs - Appellants,

versus

SAFEMARK SYSTEMS, LP,

                                              Defendant - Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(July 26, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This consolidated appeal requires us to decide whether, under the Telephone Consumer Protection Act, 47 U.S.C. § 227, a fax recipient provided prior express permission to receive faxes from a sender and, if so, whether the faxes needed to contain opt-out notices under an agency regulation. Gorss Motels, Inc., and E&G, Inc., operate hotels as franchisees of Wyndham Hotel Group. In their franchise agreements, the hotels agreed that Wyndham affiliates could offer assistance with purchasing items for their hotels and provided their fax numbers. Safemark Systems, a Wyndham affiliate that provides safes to franchisees, sent two faxes to franchisees, including Gorss and E&G. The hotels filed a complaint against Safemark on behalf of a putative class alleging that the faxes violated the Act, which makes it unlawful to send certain unsolicited fax advertisements. The district court denied class certification and concluded that the solicited-fax rule, a regulation of the Federal Communications Commission that required solicited faxes to include compliant opt-out notices, 47 C.F.R. § 64.1200(a)(4)(iv) (effective until March 19, 2019), was invalid. The district court later granted summary judgment to Safemark. It ruled that the faxes did not violate the prohibition on unsolicited faxes because the hotels had provided prior express permission to receive faxes from Safemark in their franchise agreements. And the district court reiterated that, because the faxes were solicited, they did not need to contain compliant opt-out notices. While these appeals were pending, the Commission

eliminated the solicited-fax rule in the light of our sister circuit's decision that the rule is invalid, *see Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078 (D.C. Cir. 2017), *cert. denied* 138 S. Ct. 1043 (2018). Because we agree that the faxes were solicited and need not have contained opt-out notices, we affirm.

## I. BACKGROUND

Gorss Motels and E&G operate hotels as franchisees of Wyndham Hotel Group. To become Wyndham franchisees, both hotels executed franchise agreements, which required them to maintain Wyndham's standards at their hotels. Those standards included that the hotels must purchase or obtain certain items only from suppliers that Wyndham approved. In section 4.4 of the franchise agreement, the hotels agreed that Wyndham "may offer optional assistance to [them] with purchasing items used at or in the Facility." And the hotels agreed that Wyndham's "affiliates may offer this service on [its] behalf." The hotels provided their fax numbers in a later section of the agreement. Over their years as Wyndham franchisees, the hotels also provided their fax numbers on several "Contact Information" forms.

To assist its franchisees with purchasing items for their hotels, Wyndham facilitated the "Approved Supplier Program" through its wholly owned subsidiary Worldwide Sourcing Solutions. The Approved Supplier Program benefits

franchisees by identifying suppliers with products that conform to Wyndham's standards and by obtaining competitive pricing on those products. Franchisees receive communications about suppliers in the program from Wyndham. And at Wyndham's annual conference, which franchisees attend, approved suppliers set up booths to promote their products. Gorss and E&G registered for these conferences and again provided their fax numbers on their registration forms.

Suppliers who are part of the Approved Supplier Program have access to the franchisees. To participate in the program, suppliers are required to pay a fee, part of which creates a marketing fund that each supplier may use for various marketing opportunities directed at the franchisees. Suppliers also gain access to a database containing the franchisees' contact information. The database included the fax numbers of Gorss and E&G.

Safemark, a company that manufactures, leases, and sells safes, was an approved supplier of safes for Wyndham franchisees. In 2013, Safemark hired a fax broadcasting company to send a one-page fax to the franchisees using the contact information from the Approved Supplier Program's database. The 2013 fax advertised Safemark's safes and promoted its booth at an upcoming Wyndham conference. It contained no notice of how a recipient could opt out of receiving future faxes from Safemark. The 2013 fax was transmitted to 7,402 recipients, including Gorss.

Near the end of 2015, Desiree Rico, a Worldwide Sourcing marketing manager, emailed Michele Anderson, Safemark's contracts manager, to inquire whether Safemark would like to spend the remainder of its marketing fund for that year. Rico suggested several marketing options, including an upcoming fax blast to Wyndham franchisees and banner advertisements on the Wyndham franchisee website. Anderson forwarded the email to Nancy Wright, the Safemark Vice President of Sales. Wright later recalled speaking to Anderson about the fax blast and "probably said fine." Anderson responded to Rico's email by requesting that the banner ads redirect users who click them to a specific page on Safemark's website, but she did not mention the fax blast. The next day, Rico sent Anderson an email confirming that the fax blast would occur the first week of December and attached a copy of the Safemark fax.

During the first week of December 2015, Worldwide Sourcing sent a five-page fax to the franchisees promoting the products of several approved suppliers, including Safemark. Each page of the fax promoted a different supplier's product. The bottom of each page contained an opt-out notice with a Wyndham email and phone number. The 2015 fax was transmitted to 3,328 recipients, including Gorss and E&G.

Gorss filed a complaint, which E&G later joined, against Safemark alleging that the 2013 and 2015 faxes violated the Telephone Consumer Protection Act, 47

U.S.C. § 227. After discovery ensued, the hotels moved for certification of two

classes, one for recipients of the 2013 fax and one for recipients of the 2015 fax.

To satisfy the requirement for class actions that common questions predominate,

*see* Fed. R. Civ. P. 23(b)(3), the hotels argued that the question whether the faxes

contained deficient opt-out notices was common to the class. The hotels contended

that, regardless of whether the faxes were unsolicited or solicited, they required

compliant opt-out notices because the Act requires an opt-out notice on unsolicited

faxes, 47 U.S.C. § 227(b)(1)(C), (b)(2)(D), and a regulation from the Federal

Communications Commission known as the "solicited-fax rule" required the same

opt-out notice on solicited faxes, 47 C.F.R. § 64.1200(a)(4)(iv) (effective until

March 19, 2019). After Gorss filed its complaint, Safemark petitioned the

Commission for a retroactive waiver of the solicited-fax rule for its faxes. *See*

*Petition of Safemark Systems, LP for Retroactive Waiver of 47 C.F.R. §*

*64.1200(a)(4)(iv)*, CG Docket Nos. 02-278, 05-338 (filed Oct. 6, 2016).

The district court denied class certification. It ruled that common questions

did not predominate because it would be required to conduct individual inquiries

into whether each fax recipient had given permission for Safemark to send the

faxes—that is, whether the faxes were solicited. The district court rejected the

hotels' argument that, even if the faxes were solicited, the solicited-fax rule

required them to contain compliant opt-out notices. The district court relied on a

decision from the District of Columbia Circuit holding that the solicited-fax rule was unlawful, *see Bais Yaakov*, 852 F.3d 1078. "Without determining whether *Bais Yaakov* is binding in this Circuit," the district court found "the opinion to be persuasive" and declined to apply the solicited-fax rule to Safemark's faxes—that is, if the faxes were solicited, the district court concluded that Safemark's faxes need not have contained opt-out notices. "Given that the Solicited Fax Rule d[id] not apply, and the issues of consent [could not] be resolved without individualized inquiry," the district court ruled that common questions did not predominate and so class certification was inappropriate.

We granted the hotels permission to appeal the denial of class certification. But the district court denied the hotels' motion to stay the proceedings while its interlocutory appeal was pending. Both parties moved for summary judgment.

Meanwhile, the Commission issued an order eliminating the solicited-fax rule. *See* Order, *Petitions for Reconsideration and/or Declaratory Ruling and Retroactive Waiver of 47 C.F.R. § 64.1200(a)(4)(iv) Regarding the Commission's Opt-Out Notice Requirement for Faxes Sent with the Recipient's Prior Express Permission*, 33 FCC Rcd. 11179, 11179 (Nov. 14, 2018) [hereinafter Elimination Order]. In the same order, the Commission "dismiss[ed] as moot the ten pending petitions for retroactive waiver," which included Safemark's petition. *Id.* at 11183; *see also id.* at 11182 n.21 (listing pending petitions). The elimination of the

solicited-fax rule would become effective when it was published in the Federal

Register. *Id.* at 11184.

The next day, the district court granted summary judgment to Safemark and

denied the hotels' motion. It ruled that the faxes were solicited and so not subject

to the Act because the hotels had given their prior express permission to receive

faxes from Safemark. It reasoned that the hotels had given their permission by

agreeing in their franchise agreements that Wyndham and its affiliates could

contact them about purchasing items for their hotels and by providing their fax

numbers to Wyndham in the franchise agreements and on several other occasions.

And the district court relied on its earlier ruling that solicited faxes do not require

opt-out notices.

The hotels appealed the summary judgment, and we consolidated that appeal

with the earlier appeal of the denial of class certification. While the hotels' appeals

were pending, the Commission's order eliminating the solicited-fax rule was

published in the Federal Register and so became effective. *See Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991:*

*Regarding the Commission's Opt-Out Notice Requirement for Faxes Sent With the*

*Recipient's Prior Express Permission*, 84 Fed. Reg. 10266, 10266 (FCC Mar. 20,

2019).

## II. STANDARD OF REVIEW

We "review[] *de novo* summary judgment rulings and draw[] all inferences and review[] all evidence in the light most favorable to the non-moving party." *Freixa v. Prestige Cruise Servs.*, 853 F.3d 1344, 1346 (11th Cir. 2017) (quoting *Craig v. Floyd County*, 643 F.3d 1306, 1309 (11th Cir. 2011)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

To protect consumers from unsolicited fax advertisements, Congress passed the Telephone Consumer Protection Act in 1991 and amended it with the Junk Fax Prevention Act in 2005. *See* Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified as amended at 47 U.S.C. § 227); Pub. L. No. 109-21, 119 Stat. 359 (2005) (codified at 47 U.S.C. § 227). Congress authorized the Federal Communications Commission to issue regulations to implement the Act. *See* 47 U.S.C. § 227(b)(2). The Act prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." *Id.* § 227(b)(1)(C). It defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express

invitation or permission, in writing or otherwise." *Id*. § 227(a)(5). Safemark does not contest that its faxes were advertisements. The Act contains an exception that permits certain unsolicited faxes. An unsolicited fax is permissible when, among other requirements, the sender has an "established business relationship" with the recipient and includes an opt-out notice on the fax. *See id.* § 227(b)(1)(C), (b)(2)(D).

The Act supplies a private right of action for fax recipients to sue fax senders for violations of the Act or its regulations, *see id.* § 227(b)(3), and violators face stiff penalties. They are liable for the greater of a plaintiff's actual damages or $500 per violation. *Id.* And if a court finds that a defendant "willfully or knowingly" violated the Act, it may treble the damages. *Id.*

We divide our discussion in two parts. First, we explain that the district court did not err when it ruled that the faxes were solicited because the hotels gave their prior express permission to receive faxes from Safemark. Second, we explain that, because the Commission eliminated the solicited-fax rule during the pendency of this consolidated appeal, Safemark's faxes need not have contained opt-out notices. Because the district court correctly granted summary judgment to Safemark, we need not decide whether it correctly denied class certification.

### A. *The Faxes Were Solicited Because the Hotels Gave Prior Express Permission to Receive Faxes from Safemark.*

The Act prohibits the use of a fax machine to send "*unsolicited advertisement[s],*" *id.* § 227(b)(1)(C) (emphasis added), but it does not prohibit solicited advertisements. To decide whether a fax was solicited or unsolicited, we look to the Act's definition of an "unsolicited advertisement." *See Bais Yaakov*, 852 F.3d at 1082. An "unsolicited advertisement" is one that was "transmitted to a[] person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). So if a fax recipient provided his "prior express invitation or permission" to receive the fax, the fax was solicited and not subject to the Act's prohibition on unsolicited faxes. *See Bais Yaakov*, 852 F.3d at 1082.

Because the Act does not define "prior express . . . permission," we give that term "its 'contextually appropriate ordinary meaning.'" *In re Failla*, 838 F.3d 1170, 1176 (11th Cir. 2016) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* § 6, at 70 (2012)). The term "permission" is defined as "the official act of allowing someone to do something" or "[a] license or liberty to do something; authorization." *Permission*, *Black's Law Dictionary* (11th ed. 2019); *see also Permission*, *Oxford English Dictionary* (online ed.) (defining "permission" as the "action of permitting, allowing, or giving consent; consent, leave, or liberty to do something"). And "express permission" is permission "that is clearly and

11

unmistakably granted by actions or words, oral or written." *Permission*, *Black's Law Dictionary* (11th ed. 2019). The Commission has also provided some guidance on the meaning of express permission: "Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 Fed. Reg. 44144, 44168 (FCC July 25, 2003). The qualifier "prior" modifying "express permission" means that the fax recipient must have given his express permission before the fax was sent. *See Prior*, *Oxford English Dictionary* (online ed.) (defining "prior" as "[t]hat precedes in time").

The hotels argue that they never provided their prior express permission to receive faxes from Safemark, but their franchise agreements constitute an "official act of allowing" Safemark the liberty to send them faxes. In their franchise agreements, the hotels agreed that Wyndham "may offer optional assistance to [them] with purchasing items used at or in the Facility," and they specifically agreed that Wyndham "affiliates may offer this service on [Wyndham's] behalf." In a later section, the hotels provided their fax numbers. By agreeing that Wyndham affiliates could offer assistance with purchasing items for the hotels and by providing their fax numbers, the hotels gave express permission to receive fax advertisements from affiliates, including Safemark. *See Travel 100 Grp. v.*

12

*Mediterranean Shipping Co.*, 889 N.E.2d 781, 787–90 (Ill. App. Ct. 2008) (holding that a travel agency provided its express permission to receive faxes from affiliates of an industry network it had joined); *accord CE Design, Ltd. v. Speedway Crane, LLC*, 35 N.E.3d 1022, 1030–33 (Ill. App. Ct. 2015). The hotels expressly agreed to receive information about purchasing items from Wyndham affiliates, so they cannot complain that an affiliate sent them that kind of information.

The hotels argue that their franchise agreements only evince "implied" permission, but we disagree. To constitute express permission, the agreements need not use magic words. *See Travel 100 Grp.*, 889 N.E.2d at 789 (rejecting the argument that a fax recipient could not have provided its express permission if "it did not state its permission or invitation to receive advertisements in its own words"). Although express permission requires a "clear[] and unmistakabl[e] communicat[ion]," it does not require that a recipient state specifically that his permission includes faxed advertisements. *Compare Express*, *Black's Law Dictionary* (11th ed. 2019), *with Specific*, *Black's Law Dictionary* (11th ed. 2019).

Our inquiry focuses on whether a "consumer [would] understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules & Regulations*, 68 Fed. Reg. at 44168. True, the hotels' agreements did not use the words "faxed advertisements." But the franchise agreements contemplated that the hotels could receive "optional assistance" with "purchasing

items" from Wyndham and its affiliates. A reasonable consumer would understand that assistance with purchasing items entails receiving information about buying products, and an advertisement is by definition an "act of informing," which includes "the promotion of goods and services." *Advertisement*, *Oxford English Dictionary* (online ed.). And the hotels would have to receive this optional assistance with purchasing items—that is, advertisements—by some medium. By providing their fax numbers in their agreements, the hotels invited the assistance or advertisements to come by fax. The combination of these two provisions in the franchise agreement does not amount to implied permission; it establishes that the hotels "clearly and unmistakably granted by actions or words" permission for Safemark to send them faxed advertisements. *Permission*, *Black's Law Dictionary* (11th ed. 2019).

The hotels equate the provision of their fax numbers in the franchise agreements with the mere distribution of their fax numbers, but the hotels did more than merely distribute their fax numbers. The Commission has explained that "mere distribution or publication of a telephone facsimile number is not the equivalent of prior express permission to receive faxed advertisements." *In re Rules & Regulations*, 68 Fed. Reg. at 44168. But mere distribution concerns something akin to the use of a business's fax number that it listed publicly "for the convenience of [its] customers," not "for other companies' advertising purposes."

*Id.* So a business that goes through the process of joining an industry directory and agrees to furnish its fax number to industry suppliers has done "more than merely mak[e] a fax number public." *CE Design*, 35 N.E.3d at 1030.

The hotels did not merely distribute their fax numbers when they included them in their franchise agreements. Unlike a business that publicly lists its fax number only for its customers' use, the hotels executed franchise agreements in which they listed their fax numbers *and* agreed to receive information from their franchisor's affiliates, including Safemark. And Safemark did not obtain the hotels' fax numbers from a publicly available source meant for the hotels' customers; it obtained their fax numbers from Wyndham's franchisee database, to which Wyndham provided Safemark access as an approved affiliate. The hotels voluntarily decided to become Wyndham franchisees and, as part of that process, agreed to receive information from Wyndham affiliates. So the hotels did more than merely distribute or publish their fax numbers.

The hotels also suggest that the fax sender must obtain prior express permission directly from the recipient, but we disagree. To qualify as a solicited advertisement, the sender must have the recipient's "prior express invitation or permission," but nothing in the text of the Act requires that the sender obtain permission directly from the recipient. *See* 47 U.S.C. § 227(a)(5). We cannot impose a limitation that Congress did not include. *Cf.* Scalia & Garner, *Reading*

*Law* § 8, at 93 ("Nothing is to be added to what the text states or reasonably implies . . . ."). A fax recipient may provide his express permission to receive faxes from third parties, which the hotels did when they agreed in their franchise agreements with Wyndham to receive assistance with purchasing items from Wyndham affiliates. *See Travel 100 Grp.*, 889 N.E.2d at 789.

Despite their franchise agreements, the hotels contend that the testimony of Steven Gorss, the Gorss president, that the hotels never provided Safemark permission to send them faxes precludes summary judgment, but this testimony is immaterial. To preclude summary judgment, there must be an issue of fact that is material, meaning that, "under the applicable substantive law, it might affect the outcome of the case." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citation and internal quotation marks omitted). That Steven Gorss testified that the faxes were unsolicited and "[n]o supplier was ever given permission to send faxes to [Gorss]" does not affect the outcome of this case. This testimony about what Steven Gorss subjectively thought is immaterial because the hotels had already provided their express permission in their franchise agreements. And the hotels have not argued that they ever rescinded that permission. Steven Gorss also testified that he understood the franchise agreement to mean that Wyndham "affiliates could provide them information" and that "they could send [them] advertising any time they wanted," so long as they did so "legally." Because the

hotels gave their prior express permission to receive faxes from Safemark, the

faxes were solicited and so did not violate the Act.

### B. Because the Commission Eliminated the Solicited-Fax Rule, Safemark's Faxes Need Not Have Contained Opt-Out Notices.

The hotels contend that, even if the faxes were solicited, they violated the

Act because they failed to contain opt-out notices that satisfied the Commission's

solicited-fax rule. The hotels argue that the district court violated the Hobbs Act

when it refused to apply the solicited-fax rule. The Hobbs Act vests the courts of

appeals with the "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in

part), or to determine the validity" of certain agency orders. 28 U.S.C. § 2342.

According to the hotels, the district court violated that Act when it followed

the decision in *Bais Yaakov* and declined to apply the solicited-fax rule to

Safemark's faxes. The hotels point to our decision in *Mais v. Gulf Coast Collection*

*Bureau*, 768 F.3d 1110 (11th Cir. 2014), which held that a "district court exceeded

its power" when it "refus[ed] to enforce" an order of the Commission on the

ground that it was inconsistent with the Telephone Consumer Protection Act. *Id.* at

1119. In *Mais*, we interpreted the Hobbs Act's grant of exclusive jurisdiction to the

courts of appeals as stripping district courts of any power to consider the validity

of the Commission's orders—in facial, preenforcement challenges to an agency

order *and* private civil enforcement actions in which a party contests the order. *See*

*id.*; *see also Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 461 (11th Cir. 2012).

*But see PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct.

2051, 2056 (2019) (Thomas, J., concurring in the judgment) (arguing that the logic

underlying our decision in *Mais* "rests on a mistaken—and possibly

unconstitutional—understanding of the relationship between federal statutes and

the agency orders interpreting them"); *id.* at 2062 (Kavanaugh, J., concurring in the

judgment) (explaining that "the Hobbs Act does not expressly preclude review in

enforcement actions" and arguing that "[w]e cannot presume that Congress

*silently* intended to preclude judicial review").

　　To address this issue, we must consider the continued validity of the

solicited-fax rule. In 2006, the Commission promulgated a regulation that required

senders of solicited faxes to include the opt-out notice required by the Act for

unsolicited fax advertisements—the so-called "solicited-fax rule." *See Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk*

*Fax Prevention Act of 2005*, 71 Fed. Reg. 25967, 25971–72 (FCC May 3, 2006)

(formerly codified at 47 C.F.R. § 64.1200(a)(4)(iv)). The solicited-fax rule

provided that "[a] facsimile advertisement that is sent to a recipient that has

provided prior express invitation or permission to the sender must include an opt-

out notice that complies with the requirements in paragraph (a)(4)(iii) of this

section." 47 C.F.R. § 64.1200(a)(4)(iv) (effective until March 19, 2019). Paragraph

(a)(4)(iii) of that section fleshed out the statutory requirement of an opt-out notice

on an unsolicited fax. *Id.* § 64.1200(a)(4)(iii); *see also* 47 U.S.C. § 227(b)(2)(D).

After promulgating the solicited-fax rule, the Commission faced several challenges to it. In response to several petitioners' challenge in 2014, the Commission asserted that it had authority to require opt-out notices on solicited faxes, but it also granted some petitioners retroactive waivers. *See* Order, *Anda, Inc.*, 29 FCC Rcd. 13998, 13998, 14005 (Oct. 30, 2014). The Commission encouraged others to seek retroactive waivers, *see id.* at 14008, and Safemark filed a petition for a waiver in 2016.

Fax senders filed petitions for review of the 2014 order in several circuits, so the Judicial Panel on Multidistrict Litigation consolidated the petitions in the District of Columbia Circuit. In *Bais Yaakov*, the court "h[e]ld that the FCC's 2006 Solicited Fax Rule is unlawful to the extent that it requires opt-out notices on solicited faxes." 852 F.3d at 1083. The court explained that "Congress drew a line in the text of the [Telephone Consumer Protection Act] between unsolicited fax advertisements and solicited fax advertisements." *Id.* at 1082. Because "the Act requires an opt-out notice on unsolicited fax advertisements [but] does not require a similar opt-out notice on *solicited* fax advertisements," the Commission has no authority to require opt-out notices on solicited faxes. *Id.* That is, the Commission cannot "mandate[] that senders of *solicited* faxes comply with a statutory requirement that applies only to senders of *unsolicited* faxes." *Id.* at 1080.

In response to the decision in *Bais Yaakov*, the Commission eliminated the solicited-fax rule in an order. In November 2018, Patrick Webre, the chief of the Commission's Consumer and Governmental Affairs Bureau, issued the order pursuant to his delegated rulemaking authority. *See* Elimination Order, 33 FCC Rcd. at 11179; *see also* 47 C.F.R. §§ 0.141, 0.204. The chief's action has the same force and effect as actions of the Commission. 47 C.F.R. § 0.203(b). The order "eliminate[d] the Commission's rule requiring opt-out notices on faxes sent with the recipients' prior permission or consent." Elimination Order, 33 FCC Rcd. at 11179. Specifically, the order "eliminate[d] section 64.1200(a)(4)(iv) from Title 47 of the Code of Federal Regulations." *Id.* at 11183. The chief explained that "this action [was taken] in response to the decision of the Court of Appeals for the D.C. Circuit finding that the rule is unlawful." *Id.* at 11179 (citation and internal quotation marks omitted). And the chief "dismiss[ed] as moot ten pending petitions for retroactive waiver of the rule"—including Safemark's petition. *Id.*

The elimination of the solicited-fax rule took effect "upon publication of th[e] Order in the Federal Register." *Id.* at 11184. While these appeals were pending, the order was published in the Federal Register on March 20, 2019. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991: Regarding the Commission's Opt-Out Notice Requirement for Faxes Sent With the Recipient's Prior Express Permission*, 84 Fed. Reg. at 10266. And the

solicited-fax rule no longer appears in the Electronic Code of Federal Regulations. *See* 47 E.C.F.R. § 64.1200 (current as of July 24, 2019), available at http://www.ecfr.gov (last visited July 26, 2019). The solicited-fax rule no longer stands as an operative regulation.

The hotels argue that the Commission's elimination of the rule applies only prospectively and so does not preclude liability for Safemark's past violations of the rule while it was in effect, but we disagree. To be sure, the retroactive effect of the repeal of a legal obligation can pose thorny questions. The common-law rule was "that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute." *Yeaton v. United States*, 9 U.S. 281, 283 (1809) (Marshall, C.J.). This rule governed not only penalties under criminal and penal statutes but also civil statutory rights of action that had yet to be reduced to judgment. *See, e.g.*, *Curran v. Owens*, 15 W. Va. 208, 218–24 (1879) (collecting decisions); J.G. Sutherland, *Statutes and Statutory Construction* § 163, at 217 & n.6 (1891) (stating the rule that "[r]ights depending on a statute and still inchoate, not perfected by final judgment or reduced to possession, are lost by repeal or expiration of the statute" and collecting decisions).

For federal statutes, Congress later reversed the common-law rule by prescribing that "[t]he repeal of any *statute* shall not have the effect to release or

extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide." 1 U.S.C. § 109 (emphasis added). Of course, regulations are not statutes, so section 109 does not by its terms include them. It may be that the elimination of a regulation is still generally subject to the common-law rule. But we need not answer that question to resolve this appeal.

Under either the common-law rule or modern retroactivity doctrine, the retroactive effect of the elimination of a legal obligation depends ultimately on the expressed intent of the legislator. *See* Scalia & Garner, *Reading Law* § 41, at 262 ("[A] statute can explicitly or by clear implication be made retroactive."); *Curran*, 15 W. Va. at 226 ("Whether the repealing statute shall have the effect to stop proceedings in pending cases depends upon the intent of the Legislature."). Seen in this light, the contradiction between the common-law rule and the modern rule reflected in section 109 is more apparent than real. Those rules are not inflexible commands but are instead rebuttable presumptions of textual interpretation. *See* Scalia & Garner, *Reading Law* § 41, at 261 (explaining that "[t]he presumption against retroactivity is a guide to interpretation"). That both are presumptions is obvious from each rule's inclusion of a proviso that it can be dislodged by a clear expression of the contrary legislative intent. *Compare Yeaton*, 9 U.S. at 283 (forbidding post-repeal enforcement of pre-repeal liabilities "unless some special provision be made for that purpose by statute"), *with* 1 U.S.C. § 109 (stating that

repeal does not extinguish past liabilities "unless the repealing Act shall so expressly provide").

When the Commission eliminated the solicited-fax rule, both its rationale and its actions made clear that the rule could no longer be enforced against defendants, not even for past violations. The rationale for the order eliminating the solicited-fax rule was the decision in *Bais Yaakov* "that the rule [was] unlawful." Elimination Order, 33 FCC Rcd. at 11183. The Commission did not merely determine that the solicited-fax rule was bad policy and should be repealed; instead, it accepted the holding of *Bais Yaakov* that the solicited-fax rule was *invalid* and, as a result, was never legally in force at all. *See Metheny v. Hammonds*, 216 F.3d 1307, 1310 (11th Cir. 2000) (explaining that a regulation without statutory authority is "legally void"). The Commission's actions with respect to the pending waiver petitions also manifested its understanding that the elimination of the solicited-fax rule precluded liability for past violations. In the same order eliminating the solicited-fax rule, the Commission explained that, because it had eliminated the rule, it "f[ound] no need to consider the remaining pending petitions seeking temporary waiver of the rule," which included Safemark's pending petition, and dismissed Safemark's petition as moot. Elimination Order, 33 FCC Rcd. at 11183; *see also id.* at 11182 n.21 (listing pending petitions). By dismissing Safemark's petition as moot, the Commission

made clear that Safemark needed no waiver because the eliminated rule could not be applied to its faxes.

"[O]ur duty is to decide this case according to the law existing at the time of our decision." *Cort v. Ash*, 422 U.S. 66, 76 (1975). Even if the hotels could have prevailed when the solicited-fax rule was extant, the Commission has eliminated the rule and has unambiguously abated liability for any past violations of its requirements. So Safemark is entitled to judgment as a matter of law. And "[w]e may, of course, affirm the [summary] judgment of the district court on any ground that finds support in the record." *Hardison v. Cohen*, 375 F.3d 1262, 1269 (11th Cir. 2004).

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Safemark.

WILLIAM PRYOR, Circuit Judge, joined by NEWSOM and BRANCH, Circuit Judges, concurring:

Because the elimination of the solicited-fax rule applies to Safemark, we need not decide whether the district court violated the Hobbs Act when it refused to apply that rule. But I write separately to explain that our precedents have misconstrued the Act's grant of "exclusive jurisdiction" to the circuit courts "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" certain agency orders, 28 U.S.C. § 2342. Our precedents, *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453 (11th Cir. 2012), and *Mais v. Gulf Coast Collection Bureau*, 768 F.3d 1110 (11th Cir. 2014), interpret the Act to mean that an agency's interpretation of federal law in a final order is subject to only a single 60-day window for judicial review in a single circuit-court proceeding, outside of which no party to any proceeding in any court may question the agency's interpretation, no matter how wrong. Four justices of the Supreme Court have recently explained—with good reason and without any justice voicing a contrary interpretation—that the Act means no such thing and might well be unconstitutional if it did. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2057, 2062–66 (2019) (Kavanaugh, J., concurring in the judgment); *see also id.* at 2056–57 (Thomas, J., concurring in the judgment). The Hobbs Act, correctly construed, does not require district courts adjudicating cases within their ordinary jurisdiction to treat agency orders that

25

interpret federal statutes as binding precedent. Our precedents' interpretation of the Hobbs Act ignores the statutory context, generates absurd results, and raises serious constitutional doubts. In the earliest appropriate case, we should correct our mistake en banc.

The Hobbs Act, also known as the Administrative Orders Review Act, *see id.* at 2053 (majority opinion), provides for direct review of final orders of administrative agencies by petitions for review filed in the courts of appeals. In that context, the Act vests the courts of appeals with the "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" orders of certain agencies, including the Federal Communications Commission, 28 U.S.C. § 2342. The Act establishes comprehensive procedures for the exercise of that jurisdiction. An agency must provide notice "[o]n the entry of a final order reviewable under th[e] [Act]." *Id.* § 2344. Then, "[a]ny party aggrieved by th[at] final order" has "60 days after its entry" to "file a petition to review the order in the court of appeals." *Id.* The court of appeals in such a proceeding receives the administrative record, *see id.* § 2346; determines the legal questions presented, *see id.* § 2347; and ultimately may "make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency," *id.* § 2349(a). When multiple petitions for review of the same order are filed, they are consolidated in a single circuit court. *See id.* § 2112(a)(3).

This Court has construed the Act's grant of "exclusive jurisdiction" to the courts of appeals to bar district courts from so much as considering any argument—by any party, in any case—that an agency order misinterpreted the law, "no matter how wrong the agency's interpretation might be," *PDR Network*, 139 S. Ct. at 2063 (Kavanaugh, J., concurring in the judgment). In *Self v. Bellsouth Mobility, Inc.*, we held that a district court must dismiss a complaint for lack of subject-matter jurisdiction if, "[t]o prevail on her claims, [the plaintiff] must establish" a proposition of law "which would mean that [agency] orders are wrong or invalid." 700 F.3d at 462. We reasoned that, "[b]ecause the courts of appeals have exclusive jurisdiction over claims to enjoin, suspend, or invalidate a final [agency] order, the district courts do not have it." *Id.* at 461. Later, in *Mais v. Gulf Coast Collection Bureau*, we held that a district court "exceeded its jurisdiction" when it entertained and agreed with the defendant's argument that the agency order on which the plaintiff relied was unambiguously inconsistent with the governing statute. 768 F.3d at 1119. "As we s[aw] it, the district court lacked the power to consider in any way the validity of the [agency] [r]uling," including the correctness of its legal conclusions. *Id.* at 1113. These precedents are wrong.

The Act's grant of exclusive jurisdiction means that a district court may not entertain a petition for review of an agency order subject to the Act. And a district court may not suspend the effect of an agency order upon a party that the order

27

directly binds. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69–72 (1970). But the Hobbs Act does not require a district court to follow an agency's interpretation of a statute every time a case within its jurisdiction presents a question of federal law that the agency has addressed in an order.

Contrary to fundamental principles of statutory construction, our precedents latched onto the term "exclusive jurisdiction" without asking the key question: "'exclusive jurisdiction' to do what?" *PDR Network*, 139 S. Ct. at 2063 (Kavanaugh, J., concurring in the judgment). "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012). Our Hobbs Act precedents illustrate this failure.

The Hobbs Act grants the courts of appeals the exclusive jurisdiction to directly review certain agency orders by petitions for review. From beginning to end, the Act establishes procedures to govern such direct-review proceedings. *See, e.g.*, 28 U.S.C. § 2343 (defining venue for petition proceedings); *id.* § 2344 (establishing timeliness, content, and service requirements for petitions); *id.* § 2345 (authorizing prehearing conferences in petition proceedings); *id.* § 2346 (providing

for transmittal of the record from the agency to the court of appeals in petition

proceedings); *id.* § 2347 (establishing various procedural rules for petition

proceedings); *id.* § 2348 (describing the potential parties by right or intervention

and conferring a right to counsel in petition proceedings); *id.* § 2350 (providing

that the Supreme Court may exercise its normal forms of appellate jurisdiction

over decisions of the circuit courts in petition proceedings). So the Act's grant of

exclusive jurisdiction clearly means that a district court lacks jurisdiction over a

petition for review of an agency order to which the Hobbs Act applies. But nothing

in the scheme of the Act suggests—much less dictates—our further conclusion that

whenever an interpretation in an agency order touches on a legal issue in an action

within the jurisdiction of a district court, the court must either dismiss the

complaint or treat the agency order as binding precedent.

Our precedents' focus on the grant of exclusive jurisdiction in section 2342

ignores that another provision of the Hobbs Act employs the same language and

confirms that it refers only to direct review of agency orders. Under section

2349(a), "[t]he court of appeals in which the record on review is filed . . . has

exclusive jurisdiction to make and enter, on the petition, evidence, and proceedings

set forth in the record on review, a judgment determining the validity of, and

enjoining, setting aside, or suspending, in whole or in part, the order of the

agency." *Id.* § 2349(a). This provision unambiguously refers to the court of

29

appeals' direct action upon the order under petition for review, and it does so in language that is materially indistinguishable from that of section 2342. In the light of this parallel language, there is no reason to think that section 2342 refers to any proceedings other than direct review. *See* Scalia & Garner, *Reading Law* § 25, at 170 (explaining that materially identical language "is presumed to bear the same meaning throughout a text").

The judicial-review section of the Communications Act, 47 U.S.C. § 402, which incorporates the Hobbs Act by reference, also confirms that the Act's grant of exclusive jurisdiction concerns only direct review of the agency order. Section 402(a) makes certain orders of the Federal Communications Commission reviewable under the Hobbs Act. It provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . (*except those appealable under subsection (b) . . .* ) shall be brought as provided by" the Act. *Id.* § 402(a) (emphasis added). Next, section 402(b) provides that certain decisions and orders of the Commission may be directly appealed to the District of Columbia Circuit. *See id.* § 402(b). These two adjacent subsections present petitions for review under the Hobbs Act and appeals under section 402(b) as two parallel avenues of judicial review that apply to different agency actions but belong to the same basic kind. The unmistakable implication is that the words "proceeding to enjoin, set aside, annul, or suspend any order of the Commission," *id.* § 402(a), like an appeal, refer

30

to a direct-review proceeding that may result in a judgment operating directly against the agency order.

Our precedents assume that a district court that declined to follow an agency order subject to the Hobbs Act would encroach upon the courts of appeals' "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such orders, *see Mais*, 768 F.3d at 1120–21; *Self*, 700 F.3d at 461–62, but this erroneous premise flows from our failure to interpret section 2342 in the context of the whole Act. In the sole context with which the Act is concerned—that of direct review of agency orders by petitions for review—a court "determines the validity" of the order only when its judgment operates directly against the order and the agency that made it. That is, in much the same way that our disposition of an appeal operates on the judgment of the district court, a disposition of a Hobbs Act petition operates on the order under review. *See, e.g.*, *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) ("vacat[ing]" the order under review and "remand[ing]" to the agency).

But when a district court merely "*disagrees* with the agency's interpretation" of governing law in a run-of-the-mill civil action, "that ruling does not invalidate the order and has no effect on the agency's ability to enforce the order against others." *PDR Network*, 139 S. Ct. at 2063 (Kavanaugh, J., concurring in the

31

judgment) (emphasis added). "Rather, the district court simply determines that the defendant is not liable under the correct interpretation of the statute," which it determines—just as it would in any other case within its jurisdiction—"under the usual principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.* at 2063–64. By declining to follow an agency order that it thinks clearly misinterpreted the law, the district court does not "determine the validity" of that order in the sense contemplated by the Hobbs Act. *See id.* at 2063; *see also id.* at 2056 (Thomas, J., concurring in the judgment) ("Interpreting a statute does not 'determine the validity' of an agency order interpreting or implementing the statute.").

That our precedents overread the grant of exclusive jurisdiction in section 2342 becomes even clearer when we consider that other statutes provide for direct review of agency action "*and* expressly preclude judicial review in subsequent enforcement actions." *Id.* at 2059 (Kavanaugh, J., concurring in the judgment) (emphasis added) (collecting statutes). For example, one paragraph of the Clean Water Act mirrors the Hobbs Act in providing for direct review of certain agency orders in the courts of appeals if an application for review is made within 120 days. 33 U.S.C. § 1369(b)(1). The next paragraph of the Act provides that those orders "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." *Id.* § 1369(b)(2). "Congress knows how to explicitly preclude

judicial review in enforcement proceedings," and it did so years before it passed the Hobbs Act. *PDR Network*, 139 S. Ct. at 2061 (Kavanaugh, J., concurring in the judgment); *see also id.* at 2064–65 (discussing the Emergency Price Control Act of 1942, which combined an analogous grant of "exclusive jurisdiction" with an explicit bar on other courts' "power to consider the validity of" covered agency actions (citation omitted)). And "elementary principles of administrative law establish that the proper default rule is to allow [judicial] review" unless Congress says otherwise. *Id.* at 2060; *see also see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) ("begin[ning]" statutory construction "with the strong presumption that Congress intends judicial review of administrative action"). That Congress enacted the Hobbs Act without "expressly preclud[ing] as-applied judicial review of an agency interpretation in subsequent enforcement proceedings" underscores our precedents' error in giving it that effect. *PDR Network*, 139 S. Ct. at 2063 (Kavanaugh, J., concurring in the judgment).

Consider the stark implications of our misconstruction of the Hobbs Act. Under our interpretation, in "a dispute between private parties," the party that "did not even initiate th[e] suit" may not be heard to argue that the agency order being enforced against him misinterpreted the law. *Id.* at 2056 (Thomas, J., concurring in the judgment); *cf. Mais*, 768 F.3d at 1120–21. Conversely, a plaintiff with a viable claim under the law Congress enacted may be unable to pursue it simply because

an agency has misinterpreted the law in an order to which he was a not a party. *Cf.*

*Self*, 700 F.3d at 461–64. These bars may apply even if the party had no reason to

file a petition for review when the order was made and possibly even if the party

*did not exist* when the order was made.

True, the Administrative Procedure Act may provide an exception to our

reading of the Hobbs Act for a party who had no "prior" and "adequate"

"opportunity for judicial review," 5 U.S.C. § 703; *see also PDR Network*, 139 S.

Ct. at 2055–56 (majority opinion), but it is doubtful that the Hobbs Act's grant of

exclusive jurisdiction depends on an individual assessment of the adequacy of a

party's prior opportunities to challenge an order. Such case-by-case, party-by-party

determinations of adequacy would be difficult to evaluate—contravening the

general principle that "jurisdictional rules should be clear." *Lapides v. Bd. of*

*Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 621 (2002).

At least in the ordinary case, our precedents task *all* persons with both the

foreknowledge—some would say the clairvoyance—to identify any agency orders

that *might* concern them in future litigation and the resources to bring an

immediate challenge against each of those orders. "Requiring all those potentially

affected parties to bring a facial, pre-enforcement challenge within 60 days or

otherwise forfeit their right to challenge an agency's interpretation of a statute

borders on the absurd." *PDR Network*, 139 S. Ct. at 2062 (Kavanaugh, J.,

34

concurring in the judgment); *see also Adamo Wrecking Co. v. United States*, 434

U.S. 275, 290 (1978) (Powell, J., concurring) (observing that it "is totally

unrealistic to assume that more than a fraction of the persons and entities affected

by [agency action]—especially small contractors scattered across the country—

would have knowledge of its promulgation or familiarity with or access to the

Federal Register").

Our precedents attempt to sweeten this bitter pill by suggesting that a party

to a private civil action could "ask the [agency] to reconsider its interpretation" and

then "challenge the [agency's] response in the court of appeals," *Mais*, 768 F.3d at

1121; *see also Self*, 700 F.3d at 462, but this "promise of an alternative path of

judicial review is empty," *PDR Network*, 139 S. Ct. at 2065 (Kavanaugh, J.,

concurring in the judgment). "[J]udicial review may not always be available under

that route." *Id.* at 2065–66. For example, a petition for reconsideration of an order

of the Commission must be filed within 30 days, less time than the Hobbs Act

affords for a petition for review. *See* 47 U.S.C. § 405(a). And the Commission has

no duty to issue declaratory rulings. *See* 47 C.F.R. § 1.2(a) ("The Commission

*may* . . . issue a declaratory ruling" as provided by the Administrative Procedure

Act. (emphasis added)); 5 U.S.C. § 554(e) ("The agency, . . . *in its sound

discretion*, *may* issue a declaratory order . . . ." (emphasis added)). "And even if

judicial review is available, it may only be deferential judicial review of the

agency's discretionary decision to decline to take new action, not judicial review of the agency's initial interpretation of the statute." *PDR Network*, 139 S. Ct. at 2066 (Kavanaugh, J., concurring in the judgment).

Unsurprisingly, if the Hobbs Act meant what we have said it means, its constitutionality would be in doubt. For one, our interpretation "raises significant questions under the Due Process Clause." *Id.* at 2062. As we have construed it, the Hobbs Act prevents parties "from raising arguments about the reach and authority of agency rules enforced against them." *Id.* So it effectively grants agency orders binding, issue-preclusive effect with respect to *every* party in *every* possible suit that may come before a district court. As the Supreme Court has long acknowledged, due process generally prohibits the issue preclusion of nonparties. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971); *see also Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (enumerating the six limited exceptions to this rule). But, under our interpretation, the Hobbs Act estops vast numbers of nonparties who—if and when it eventually matters to them— might wish to advance a view of the law different from that of the agency.

Our interpretation also threatens the separation of powers. If our precedents were correct that district courts could never second-guess agency interpretations in orders subject to the Hobbs Act, "then the Act would trench upon Article III's vesting of the 'judicial Power' in the courts." *PDR Network*, 139 S. Ct. at 2057

(Thomas, J., concurring in the judgment); *see also* U.S. Const. art. III, § 1. "[T]he judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws," and that duty "necessarily entails identifying and applying the governing law." *PDR Network*, 139 S. Ct. at 2057 (Thomas, J., concurring in the judgment) (citation and internal quotation marks omitted).

To be sure, district courts must sometimes defer to agency interpretations of statutes. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). But that deference only occurs if the district court determines that the governing statute is ambiguous—a determination that requires the district court to consult first the text of the statute. *See id.* at 842–43. By contrast, our interpretation of the Hobbs Act prevents district courts from even considering the statute and instead requires them to "treat [agency] interpretations of the [statute] as authoritative," no matter how patently incorrect. *See PDR Network*, 139 S. Ct. at 2057 (Thomas, J., concurring in the judgment) (citation and internal quotation marks omitted). That is, our interpretation requires not "mere . . . deference" to agency interpretations but absolute "abdication" of the judicial power to determine the law that governs a case. *Id.* at 2066 (Kavanaugh, J., concurring in the judgment). The Supreme Court has never suggested that Congress can transfer that core judicial power to an agency wholesale. *See Commodity Futures Trading*

*Comm'n v. Schor*, 478 U.S. 833, 851 (1986) (highlighting the constitutional

significance of "the extent to which the 'essential attributes of judicial power' are

reserved to Article III courts"). In the same vein, by "requir[ing] courts to give the

force of law to agency pronouncements on matters of private conduct without

regard to the text of the governing statute," the Act as we have interpreted it would

effectively "permit a body other than Congress to exercise the legislative power, in

violation of Article I." *PDR Network*, 139 S. Ct. at 2057 (Thomas, J., concurring in

the judgment) (citation and internal quotation marks omitted); *see also* U.S. Const.

art. I, § 1.

At a minimum, we should reconsider our precedents to avoid these serious

constitutional difficulties. *See* Scalia & Garner, *Reading Law* § 38, at 247

(explaining that, under the constitutional-doubt canon, "[a] statute should be

interpreted in a way that avoids placing its constitutionality in doubt"); *see also*

*PDR Network*, 139 S. Ct. at 2062 (Kavanaugh, J., concurring in the judgment)

(suggesting the application of the constitutional-doubt canon to the Hobbs Act).

When a court is "deciding which of two plausible statutory constructions to adopt,"

"[i]f one of them would raise a multitude of constitutional problems, the other

should prevail" based on "the reasonable presumption that Congress did not intend

the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543

U.S. 371, 380–81 (2005). As I have explained, an alternative reading of the Hobbs

Act is not only plausible but compelling. The Act excludes district courts from participating in the direct review of agency orders, but it does not require district courts exercising their ordinary jurisdiction to treat agency orders as if they were binding precedent. Instead of perpetuating an incorrect—and probably unconstitutional—interpretation of the Hobbs Act, we should overrule our decisions in *Self* and *Mais* en banc as soon as an appropriate case comes before us.